734 F.2d 1248
 UNITED STATES of America, Plaintiff-Appellee,
v.
Leonard R. CHEREK, Defendant-Appellant.
 No. 82-3022.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 1, 1983.
Decided May 21, 1984.
As Amended May 22, 1984.
 
 Wayne J. Staton, Madison, Wis., for defendant-appellant.
 Grant C. Johnson, Asst. U.S. Atty., John R. Byrnes, U.S. Atty., Madison, Wis., for plaintiff-appellee.
 Before PELL, BAUER, Circuit Judges, and MAROVITZ, Senior District Judge.*
 PELL, Circuit Judge.
 
 
 1
 Defendant-appellant Leonard R. Cherek was tried in federal district court on charges of violating 18 U.S.C. Sec. 152, which prohibits the knowing and fraudulent concealment of assets belonging to the estate of a bankrupt. In this case there was a single asset, a 1974 Jaguar automobile titled in the name of the bankrupt debtor corporation, Delta Plumbing, Inc., of which Cherek was president and principal owner. During deliberations the jury sent the trial judge a request for clarification of a point of law, a request which the judge denied after consultation with counsel for each party. Following conviction, the trial judge sentenced defendant to a prison term of one year and one day, plus three years probation and ordered him to pay a fine of $5,000. Thereafter defendant filed a motion for a new trial based on newly discovered evidence, which motion was denied. Defendant now appeals from his conviction.
 
 I. FACTS
 
 2
 Cherek on this appeal raises only two issues, being the claimed error of the trial court in not answering the jury's question and the denial of the motion for a new trial. He does not challenge the sufficiency of the evidence. Nevertheless, for an understanding of the issues it is necessary to refer briefly to the checkered history of the Jaguar. The chronology of events relating to this automobile is not easy to ascertain as the appellant brought up only a partial record presumably because he was not challenging the sufficiency of the evidence. What he did bring up for the most part consisted of the transcripts of testimony of witnesses that he apparently regarded as favorable to him. Although the facts must be viewed in the light most favorable to the Government, we think as nearly as we can piece the story together it is as follows.
 
 
 3
 In 1975 Cherek was a part owner with William Currier of Custom Drywall, Inc. (Custom). Cherek arranged for the purchase of the Jaguar, which was paid for by the corporation and used by him during his continuance with Custom.
 
 
 4
 In January 1977, Cherek having become president and major stockowner of Delta Plumbing, Inc. (Delta), Currier bought out Cherek's interest in Custom and part of the consideration of the purchase was the transfer of the title of the Jaguar. This was not transferred to Cherek personally but to Delta. During the time that the title was in Delta's name, the corporation paid the insurance premiums, fuel expenses, and repair bills on the automobile. The automobile was shown as being owned by Delta on its books and there was some indication in the papers brought up on this appeal that Delta carried the automobile on its depreciation schedule and took depreciation for it.[1]
 
 
 5
 During the time the corporation was getting a number of contracts in 1977 and 1978, Cherek used the car in connection with the business of the company as well as using it for personal purposes. At the same time the other owner of Delta, Edmund Johnson, was driving a 1973 Thunderbird, which was also shown on the books of the company. Cherek at some time about April 1979, at a time when the business was apparently failing, turned over the possession of the Jaguar, without receiving any consideration in return, to an acquaintance, Donna Taylor. On July 2, 1979, Delta filed its petition under Chapter 11 of the Bankruptcy Code on the basis that it was insolvent and intended to file a plan. Neither the Jaguar nor the Thunderbird appeared on the schedule of assets belonging to the bankrupt corporation. Johnson subsequently turned in his automobile to the bankruptcy estate on the basis that Delta had paid for the automobile.
 
 
 6
 In the "Statement of Affairs for Debtor Engaged in Business," Question 8 reads as follows:
 
 
 7
 8. Property held for another person.
 
 
 8
 What property do you hold for any other person? (Give name and address of each person, and describe the property, the amount of value thereof and all writings relating thereto.)
 
 
 9
 and was answered as follows:
 
 
 10
 Leased trucks--Kayser Leasing Co. two leased trucks; valued at $6000; covered by conventional lease documents
 
 Question 14(a) reads as follows:
 
 11
 a. Have you made any gifts, other than ordinary and usual presents to family members and charitable donation, during the year immediately preceding the filing of the original petition herein? (If so, give names and addresses of donees and dates, description, and value of gifts.)
 
 
 12
 and was answered as follows:
 
 
 13
 none
 
 
 14
 The statement was executed by Cherek as president of Delta.
 
 
 15
 On July 7, 1979, five days after the filing of the bankruptcy petition, Delta transferred title of the Jaguar to Donna Taylor. She kept possession for several months but in late summer or early fall of 1979 the possession of the Jaguar was delivered to an attorney as collateral for fees for work being performed in connection with either Delta or another business in which Cherek was involved, Mustang Retreaders, which was also having financial problems. Eventually in 1981, title was transferred to one of the attorneys and credit was given on the attorney's fees. The execution of the title document was by Donna Taylor although she had no other connection with the automobile for a couple of years.
 
 
 16
 During the course of its deliberations, the jury made three written requests to the trial judge. The first was for a copy of the indictment, which the court after consultation with the attorneys declined to send to the jury. This question is not involved as an issue in this appeal although Cherek, even though conceding that the denial of the indictment might not have been an abuse of discretion, contends that in the light of the second and third requests which came from the jury as two separate parts of one question the request for the indictment should have indicated to the court some confusion in the mind of the jury. One part of the second question being whether the debts were relieved in bankruptcy proceedings such as taxes, rent, and liabilities to the stockholders, it was agreed by counsel that this question should not be answered as it would involve a detailed discussion of the bankruptcy law and was not appropriate at the time. The other question and its handling is the principal first prong of the appeal. That question was as follows:
 
 
 17
 1. On page 3 of the bankruptcy pet. does question 14 include the transfer of personal assets of the corp. officers?
 
 
 18
 An extended conference took place between the court and counsel. The Government objected to any response other than to tell the jury it would have to consider the evidence as the jurors remembered it and the instructions as given by the court; further observing that the jury was asking to explain something that didn't really have anything to do with the case being outside the evidence. While the Government did not elaborate on this objection, we note that question 14 refers to transfers made during the year immediately preceding the filing of the petition. The title of the Jaguar had remained at all times during that one year period in the name of the corporation and was not transferred until subsequent to the filing date. Cherek's attorney contended that the question should be answered by a simple "no." The court agreed that this would be a simple way of answering it but did not believe that the question fell within the confines of the jury's deliberation while Cherek continued to argue that the simple answer was appropriate evidently as the jury was "troubled" and "might go down the wrong road" if the correct answer was not supplied. The court was still concerned that the matter was outside the charge given the jury and declined to answer it. Counsel for Cherek then suggested that he thought it would be more appropriate for the court merely to decline to answer the question without referring back to the indictment and that he was thinking along the line that the court had read the questions and felt that it was not within the province of the court to answer the questions. The court did adopt essentially this language and counsel for Cherek stated he had no problem with that.
 
 
 19
 The jury returned a verdict of guilty, and subsequent to the judge sentencing defendant, defense counsel moved for a new trial. The motion was based on newly discovered evidence, namely records showing that during April and May of 1979, defendant transferred more than $34,000 of personal funds to the corporation. Defense counsel's affidavit accompanying the motion argued that the transfer of funds, occurring at approximately the same time defendant made a gift of the Jaguar valued at only $5,000, established "a complete lack of intent on behalf of the Defendant to commit any unlawful act." The district court set a short briefing schedule and hearing date for approximately one month from the date of the motion filing. Counsel for defendant informed the court he was unable to meet the briefing schedule, but he did appear before the trial judge on the hearing date prepared to submit evidence in support of the motion. After reviewing the affidavit, but without allowing counsel to submit evidence regarding defendant's diligence in uncovering the newly found records, the trial judge denied the motion. The trial judge apparently based his decision on two grounds. First, he doubted whether defendant had diligently tried to discover the records before trial. Second, he questioned the materiality of the records and concluded that the pre-petition transfer of funds had "no bearing whatsoever" on the post-petition concealment.
 
 II. DISCUSSION
 A. The Jury's Request
 
 20
 Appellant relies on United States v. Bolden, 514 F.2d 1301 (D.C.Cir.1975), for the proposition that "when a jury shows confusion, a trial judge is under an obligation to respond" and abuses his discretion by failing so to respond. Id. at 1308. Appellant's reliance on Bolden, however, is misplaced. In Bolden, the jury asked a perceptive question about a matter directly germane to the issues it had to resolve. In the instant case, the jury's question was not useful to the performance of its designated task. Although a trial court is under an obligation conscientiously to clarify the confusion of a jury endeavoring to understand one of the initial instructions, it acts within its discretion when it refuses to answer a potentially misleading question. See United States v. Papia, 560 F.2d 827, 843-44 (7th Cir.1977); United States v. Castenada, 555 F.2d 605, 611 (7th Cir.), cert. denied, 434 U.S. 847, 98 S.Ct. 152, 54 L.Ed.2d 113 (1977).
 
 
 21
 Appellant was charged with knowingly and fraudulently failing to disclose to the bankruptcy court, the trustee, or the creditors in bankruptcy the existence of a particular corporate asset. The two principal elements of the crime were (1) concealment and (2) knowledge and fraudulent intent. As we have already observed, this question of the jury based on question 14 in the Statement of Affairs had nothing to do with the time frame of the prosecution. The title to the Jaguar was in the name of Delta for the entire year preceding bankruptcy and the transfer of the title was subsequent to that date. We do note that Cherek, according to the testimony of Donna Taylor, did give the automobile to her sometime before May 21st, possibly March or April, but the corporation did not transfer the title until after the petition had been filed. Donna's testimony indicated that she had "signed off the title," and had given it back to Cherek before September 1979.
 
 
 22
 Cherek did testify that he gave the car to Donna Taylor in the early spring of 1979. Even though there is no indication by anyone that this was a corporate action and the Statement of Affairs referred only to corporate acts of transfer, on the basis that the jury might have thought that there was a transfer prior to filing the petition through the process of change of possession, we do look further at the problems that might have been created by answering "no" as urged by Cherek. While the jury might have construed the answer as evidence that the appellant subjectively believed the Jaguar belonged to him alone, the answer if the jury regarded the change of possession as a transfer could have been treated as substantial evidence of concealment of an asset by a failing corporation prior to anticipated bankruptcy.
 
 
 23
 It would be speculative to endeavor to articulate, as does the dissent, just what motivated the jury to ask this question. We decline to engage in such speculation but do disagree with the dissent that this somewhat opaque question "clearly indicated" the use to which the jury intended to put the answer to question 14. What may be clearer is that the jury was not putting the evidence to the uses directly helpful to performing the task it faced. Given the jury's apparent misdirection, the trial judge first faced the decision whether to give an unqualified "no" answer to the jury's question. Had he given the unqualified answer, the jury could have taken the judge's response as tacit approval of its line of inquiry, and it might well have delved further into issues not germane to its task. The judge avoided placing undue emphasis on an apparently misdirected line of inquiry, and that decision was well within the boundaries of his discretion. Papia, supra, at 843-44. The judge then had to decide between giving a qualified answer and refusing to answer the jury's question, the latter alternative being equivalent to throwing the jury back on its initial set of instructions. The judge, using his discretion to assess the relative difficulty of the case and the ability of the jurors, made a determination that his initial instructions were adequate guidance for the jury to accomplish its designated task. After independently reviewing those instructions, we conclude that they clearly and precisely set forth the elements of the case and the issues for the jury to determine. In addition, we find nothing in the record to indicate that the trial judge misperceived the difficulty of the case or the ability of the jurors. We accordingly are unwilling to disturb the trial judge's exercise of judgment.
 
 B. The Motion for a New Trial
 
 24
 For a defendant to obtain a new trial on the basis of newly discovered evidence under Rule 33 of the Federal Rules of Criminal Procedure, he must show that the evidence (1) came to his knowledge only after trial; (2) could not have been discovered sooner had he exercised due diligence; (3) is material; and (4) would probably lead to an acquittal in the event of a new trial. United States v. Hedman, 655 F.2d 813, 814 (7th Cir.1981); United States v. Robinson, 585 F.2d 274, 278 n. 4 (7th Cir.1978), cert. denied, 441 U.S. 947, 99 S.Ct. 2171, 60 L.Ed.2d 1051 (1979).
 
 
 25
 Cherek argues that the district judge erred when he denied defense counsel permission to submit evidence documenting appellant's diligent effort to discover before trial the proffered record. We believe the trial judge correctly found that defendant failed to sustain the burden of proof regarding the materiality of the proffered records. We do note that copies of the various checks constituting the $34,000 were attached to the affidavit supporting the motion for a new trial and although these were drawn for the most part on Cherek's wife's "household account," all but one were signed by Cherek himself and it is totally beyond belief that he was not aware of having written these checks. Consequently, it is equally difficult to believe that this was newly discovered evidence. Nevertheless, we do not need to rest upon this ground.
 
 
 26
 Appellant was charged with knowingly and fraudulently failing to inform the bankruptcy court, trustee, or the creditors in bankruptcy of the existence of a particular asset. Even if the jury had been aware of defendant's funneling of funds to the corporation, defendant failed to show that this fact was material to the issue of guilt or innocence. Corporate officers may capitalize a corporation extremely well, yet they still have no right to withhold information from the bankruptcy court, trustee, or creditors concerning the assets of the corporation once the petition in bankruptcy has been filed. Moreover, the use to which defendant wanted to put the new evidence could in fact be damaging to his defense; by claiming he removed the car from the corporation because he felt he was justified in exchanging the car for cash well in excess of the car's value, defendant would undermine his contention that he had believed that the car at all times was his personal asset.
 
 
 27
 The post-trial hearing transcript reveals that the trial judge carefully reviewed defense counsel's affidavit, afforded him an opportunity to argue the materiality of the proffered records and thoughtfully evaluated that oral presentation. The trial judge then concluded that even if the records of payments were taken as a fact, defendant could not prevail on a motion for new trial. We believe the trial judge's conclusion to be correct and consequently affirm the denial of defendant's motion.
 
 C. Ownership of the Vehicle
 
 28
 During the trial, the thrust of Cherek's contention of innocence appears to have been that he was really the owner of the Jaguar and therefore subjectively he was not in violation of his duties under the bankruptcy action and was not concealing property of the corporation. As we have previously observed, Cherek on this appeal does not challenge the sufficiency of the evidence and we are of the opinion on the basis of the evidence introduced that he could not properly now do so. We are not unmindful of cases in which ownership of an automobile has been determined legally to be in someone other than the registered title owner. This is frequently in a parent-child relationship where the automobile is really considered to belong to the child but for one reason or another the title has been put in the name of the parent. These are usually in other areas of the law than bankruptcy but at least in one case of which we are aware, In re Sommer, 28 B.R. 95 (Bkrtcy.D.Colo.1983), this issue was presented in a bankruptcy case. The facts of that case presented an entirely different situation than the case at bar. It is true in both cases that the son in Sommer paid the entire sum needed to purchase the car as Cherek claimed to have done here and in both instances the title was registered in somebody else's name. In the Sommer case this was because the son was a minor and the automobile dealer required a joint purchase with joint titling. The cases veer apart, however, when we note that the parent had never paid any insurance fees, repair expenses or taxes on the automobile, which happened also to be a Jaguar. Also, in response to question 5 of the Statement of Affairs "Property Held for Another Person" the father honestly answered that he was named on the title of the Jaguar owned by his son and Cherek evidenced no similar honesty but listed only leased trucks even though now claiming that he was the owner of the car.
 
 
 29
 While 18 U.S.C. Sec. 152 possesses criminal sanctions for concealment of property belonging to the estate of a bankrupt there is nothing in Sommer or similar cases to compel us to find appellant's conviction to be plain error. There was a colorable argument that Delta held more than merely nominal title. The automobile was used for company business, it appeared on the company's books, the company paid for the car's fuel, repairs, and insurance. It is a reasonable reading of 18 U.S.C. Sec. 152 to conclude that the statute requires a bankrupt to disclose the existence of assets whose immediate status in bankruptcy is uncertain. Even if the asset is not ultimately determined to be property of the estate under the technical rules of the Federal Bankruptcy Code, Section 152 properly imposes sanctions on those who preempt a court's determination by failing to report the asset.
 
 CONCLUSION
 
 30
 Having considered all the arguments urged by the parties to this appeal, we conclude that the trial court properly denied both the jury's request for clarification and defendant's motion for a new trial based on newly discovered evidence.
 
 
 31
 AFFIRMED.
 
 
 32
 MAROVITZ, Senior District Judge (dissenting).
 
 
 33
 Because I believe that Cherek was convicted by a confused jury, I must respectfully dissent from the majority opinion. In my opinion it was error for the trial judge to refuse to answer the jury's inquiry about question # 14 of the Statement of Affairs and the result of that error was a fundamentally unfair trial.
 
 
 34
 Cherek was charged with knowingly and fraudulently failing to disclose the existence of a particular corporate asset. As the majority points out, the two principal elements of the crime are: 1) concealment; and 2) knowledge and fraudulent intent. Cherek's defense was based entirely upon his assertion that because he personally paid for the auto, he believed that it belonged to him and therefore he did not intend to fraudulently conceal an asset of the bankrupt corporation. The issue of the truthfulness of Cherek's answer to question 14 was raised throughout the trial. Indeed, the prosecution strenuously attempted to get Cherek to admit on cross-examination that his answer to question 14 was incorrect based upon his transfer of possession of the auto to Donna Taylor in or about April 1979. Cherek consistently maintained that his answer to question 14 was correct because he personally was the owner of the auto rather than Delta Plumbing, the bankrupt corporation. (Tr. 10/25/82 p.m. p. 18-25)
 
 
 35
 Because of the way Cherek based his defense, the issue in the trial was not whether the auto was in fact owned by Delta Plumbing, or even titled in Delta Plumbing's name, but whether Cherek subjectively thought that the auto belonged to him. If he so thought, then he lacked the requisite intent to defraud and was not guilty of the crime charged. It was in this regard that Cherek relied upon his answer to question 14 to establish his innocence, and it is in this regard that Cherek was entitled to have the jury understand the scope of question 14.
 
 
 36
 Question 14 required Cherek to report any transfer of assets of the bankrupt corporation within the past year. Cherek maintains that he reported "none", not because he had not yet transferred title to the car to Donna Taylor (as the majority suggests), but because he honestly believed that the car belonged to him. The prosecution attempted to show Cherek's intent to defraud by showing that he responded "none" to question 14 even though he had already transferred possession of the car to Donna Taylor prior to his filling out the Statement of Affairs. (Tr. 10/25/82 p.m. p. 18-25). Thus it was the prosecution that brought up question 14 in its attempt to prove fraudulent intent. When the jury requested clarification of the scope of question 14, the jurors were obviously attempting to decide whether Cherek lied on the Statement of Affairs. Since the jurors were never told that question 14 did not encompass transfers of personal assets of the corporate officers, the jury obviously did not have the opportunity to understand Cherek's theory of the case; the fact that he thought the car was his and that he did not lie on the Statement of Affairs proves that he did not have the intent to fraudulently conceal an asset of the corporation.
 
 
 37
 The fact that the jury first requested a transcript of the indictment and later requested clarification of the scope of question 14 clearly indicated some confusion amongst the jurors. "[W]hen a jury shows confusion, a trial judge is under an obligation to respond ..." United States v. Bolden, 514 F.2d 1301 (D.C.Cir.1975). The majority seeks to distinguish Bolden by stating that in the instant case the jury's question was not useful to the performance of its designated task. I respectfully disagree. The jury's question clearly indicated that they were considering the fact that either the car actually belonged to Cherek or that he thought the car belonged to him, and the jurors wanted to know if he answered question 14 honestly. In my opinion this has a direct bearing upon the issue of intent. Thus, Bolden is not so easily distinguished, especially in light of the fact that the jury was confused over such a difficult legal issue as intent. Bolden, 514 F.2d at 1308.
 
 
 38
 The majority also attempts to rely on United States v. Papia, 561 F.2d 827 (7th Cir.1977) for the proposition that although under an obligation to clarify the confusion of a jury endeavoring to understand one of the initial instructions, a trial court acts within its discretion when it refuses to answer a potentially misleading question. There was, however, nothing misleading about the jury's question in the instant case. The jurors asked a very simple question regarding the scope of question 14. All parties involved, including the trial judge, the prosecuting attorney, and the defense attorney agreed that the simple answer to the jury's question was "No". Under such circumstances, I believe that the trial judge's obligation is to clear up the jury's confusion with "concrete accuracy". Bollenbach v. United States, 326 U.S. 607, 612-13, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946) The majority's reliance on Papia is misplaced. In Papia, this Court emphasized the fact that the question posed by the jury was not amenable to an unqualified yes or no answer. As the Court stated:
 
 
 39
 We believe that under the circumstances presented here an unqualified "Yes" or "No" answer would have been inappropriate.
 
 
 40
 Papia, 560 F.2d at 844. Since in the instant case there was a simple unqualified answer to the jury's question I can see no reason for failing to give that answer.
 
 
 41
 Both the trial judge and the majority seem to feel that to answer the jury's question would have resulted in encouraging the jury to consider matters irrelevant to the charge. As I have already explained, I think that Cherek's answer to question 14 was germane to the issue of intent. Possibly more important however, is the fact that the trial judge refused to answer the jury's question because he thought that it was outside the elements of the offense. (Tr. p. 4 10/25/82 7:30 p.m.) Yet the jury had already indicated some confusion over the scope of the offense by asking for a transcript of the indictment. This request was also refused. Thus the trial judge refused to answer the jury's question because it was outside the scope of the charge even though he knew that the jury was confused about the scope of the charge. At this point an experienced trial judge should have realized that the jury was confused not only over the scope of the indictment, but also over how question 14 related to the charge and the issue of intent. If, as the majority states, "it is apparent that the jury was not putting the evidence to the uses directly helpful to performing the task it faced", then it is also apparent that the jurors were confused as to just how that evidence related to their task. The discharge of the jury's responsibility for drawing appropriate conclusions from the testimony necessarily depended upon the discharge of the judge's responsibility to give the jury the required guidance by a lucid statement of the relevant legal criteria. Bollenbach, 326 U.S. at 612, 66 S.Ct. at 405. Because the judge failed to clear the jury's confusion over how question 14 related to the issue of intent and the scope of the indictment, I must conclude that Cherek did not receive a fair trial. Accordingly, I would reverse and remand for a new trial.
 
 
 42
 I also feel compelled to voice my disagreement with how the trial judge handled Cherek's motion for a new trial. I am well aware of the high standards that must be met in order for a new trial to be granted pursuant to Fed.R.Cr.P. 33. See United States v. Hedman, 655 F.2d 813 (7th Cir.1981). And it may well be that the evidence Cherek had to offer (the $34,000.00 worth of cancelled checks) would not have likely led to an acquittal even if there was a new trial. I cannot agree however, that the evidence proffered was immaterial. Again, I feel the evidence is germane to the issue of Cherek's subjective intent. Specifically, I find it relevant that if the government's theory is to be believed, even though Cherek had just funneled $34,000.00 worth of personal assets into the corporation, he wanted a $5,000.00 car so badly that he fraudulently concealed it from the trustee. If he wanted the car that badly, and knew that it belonged to the corporation, he could have just purchased it with part of the $34,000.00 rather than risking jail. Yet Cherek has never once argued that any part of that $34,000.00 was in payment for the car. Instead he argues that the fact that he was willing to put so much money into a dying business indicates that he would not try to conceal one of the business assets. This supports his argument that he thought that the car belonged to him.
 
 
 43
 Nor can I agree with the majority's conclusion that the post-trial hearing transcript reveals that the trial judge afforded Cherek's attorney much of an opportunity to argue materiality of the proffered evidence. The transcript reveals that the judge was more concerned with defendant's due diligence than with the issue of materiality; and yet he refused to allow Cherek to present evidence of diligence. Indeed, the judge admonished Cherek's attorney when he attempted to explain that he was hoping to show due diligence at that time.
 
 
 44
 [THE COURT:] The Court would indicate that certainly many principal stockholders continually put dollars into corporations in an attempt to keep them going with the hope that it's going to make it. That has no bearing whatsoever on the matter which is presently before the Court; and it would appear to me that it is not your diligence, counsel, that the Court is concerned with but the diligence of the Defendant who now comes to the Court on December 2nd and says, "Look what I found: $34,000 of checks, which I paid to the corporation."
 
 
 45
 Certainly those checks were available to the Defendant at the time of the trial, and the Court finds that--
 
 
 46
 MR. STATON: Excuse me. May it please the Court, that's exactly what I was here to prove this morning. They were not available to us at that time.
 
 
 47
 THE COURT: Mr. Staton, I think that you can address yourself to this Court in a reasonable manner. The Court is denying the motion, and the Court is indicating to you that there was not the due diligence upon the part of the Defendant, Mr. Cherek. The Court would also indicate to you that his payment to the corporation of those funds would not have a bearing on the particular offense in which he was found to be guilty....
 
 
 48
 (Tr. 1/4/83 a.m. p. 9-10)
 
 
 49
 It is unfortunate that we do not have a complete record before us, because there are other aspects of this case that I would like to see clarified. For instance, what little record we do have indicates that the trial judge in his original Judgment and Commitment order recommended that Cherek be granted work release privileges. Yet the same day, the judge issued an amended order eliminating the work release provision. Nothing in the record before us gives any indication for this change of mind, but it may indicate that the judge was somewhat confused about what should be his final disposition of the case. There is, in my opinion, too much confusion surrounding all aspects of this case. In fact it appears that the only one not confused was the prosecutor. He knew that he wanted to put Cherek in jail. He wanted it enough that he argued against answering a simple inquiry of the jury's and later argued against allowing Cherek to remain free on bond pending this appeal. He even argued against admitting Cherek's newly discovered cancelled checks into evidence because Cherek's attorney had failed to conform to the court's briefing schedule; a schedule which was totally unreasonable since it called for the writing and filing of a reply brief within three days spanning the New Year holiday. It appears to me from the limited record we have that the trial judge was just a little overwhelmed by the overzealousness of a prosecutor more concerned with putting the defendant behind bars than with giving him a fair trial. Whatever the confusion involved in this case was, in my opinion, it was too great to allow the conviction to stand. I would reverse.
 
 
 
 *
 Abraham L. Marovitz, Senior District Judge of the Northern District of Illinois, sitting by designation
 
 
 [1]
 It is not clear from the fragmentary record brought to us whether the depreciation schedule among the papers was ever introduced into evidence. There was no controversy, however, that the Jaguar was carried on the books of the company